MARIE VANHOOSE SAYRE, trustee,[1] *vs.* JONATHAN ALAN AISNER.

No. 98-P-1052.

Plymouth. March 16, 2000. - June 8, 2001.

Present: GREENBERG, KAPLAN, & SMITH, JJ.

*Probate Court,* Jurisdiction. *Jurisdiction,* Equitable. *Adoption,* Visitation rights. *Minor,* Visitation rights. *Words,* "De facto parent."

The Probate and Family Court has the authority to exercise its equity jurisdiction and order visitation by a person who does not have standing under G. L. c. 119, § 39D [798], and it is not necessary for the person seeking visitation to allege and prove that a parent is unfit [798-799].

In a proceeding brought in Probate Court by a "surrogate grandmother" seeking visitation rights, the judge properly dismissed the complaint under rule 12(b)(6) of the Rules of Domestic Relations Procedure, without further factual inquiry into the child's best interests, where the plaintiff, who was the trustee of a trust established for the child's benefit, had never functioned as a de facto parent of the child in a manner recognized by the Supreme Judicial Court in *Youmans* v. *Ramos,* 429 Mass. 774 (1999), and *E.N.O.* v. *L.M.M.,* 429 Mass. 824 (1999). [800-801]

CIVIL ACTION commenced in the Plymouth Division of the Probate and Family Court Department on March 20, 1997.

The case was heard by *Stephen C. Steinberg,* J.

*Jordana B. Glasgow (Charles J. Bowser, Jr.,* with her) for the plaintiff.

*Allan J. Costa* for the defendant.

SMITH, J. On March 20, 1997, Marie Vanhoose Sayre filed a complaint in the Probate and Family Court against Jonathan Alan Aisner (father), seeking visitation rights with respect to his son, Adam Joseph Maurer Aisner (Adam).

On May 13, 1997, Sayre filed an amended complaint, asserting three legal theories to support her claim for visitation with

---

[1]Under the will of Anne Rogers Maurer-Shields.

Adam. First, Sayre alleged that she was a "surrogate grand-mother" and therefore was entitled to the same visitation rights as would be allowed a grandparent under G. L. c. 119, § 39D.[2] Second, she claimed that visitation between her and Adam was in his best interest and, therefore, the court had the authority to order visitation pursuant to its broad equity powers under G. L. c. 215, § 6.[3] Third, she contended that she had "constitutionally guaranteed visitation privileges" pursuant to the Fourteenth Amendment to the United States Constitution.

On May 23, 1997, Aisner filed an answer and a motion to dismiss the amended complaint pursuant to rule 12(b)(6) of the Rules of Domestic Relations Procedure (1975), or, in the alterna-tive, for summary judgment, pursuant to Mass.R.Civ.P. 56, 365 Mass. 824 (1974). He claimed in regard to his motion to dismiss that the Probate Court could not consider Sayre's claim as mat-ter of law because Sayre was not a grandparent and, therefore, lacked standing to claim visitation rights under G. L. c. 119, § 39D, or under the general equity powers granted to the probate court under G. L. c. 215, § 6. A judge ruled that, because Sayre was not Adam's biological grandparent, she lacked standing to bring a claim for visitation pursuant to G. L. c. 119, § 39D, and that the statute also precluded the court from exercising its general equity powers to grant Sayre visitation rights. The judge also ruled that he could not order visitation over the father's objection because Sayre's complaint did not allege that the father was an unfit parent. Sayre filed a timely appeal.

On appeal, Sayre contends that the judge committed error (1) in ruling that he would not exercise the Probate Court's equity jurisdiction to allow visitation because the plaintiff was not

---

[2]General Laws c. 119, § 39D, grants the grandparents of an unmarried minor child reasonable visitation rights under certain circumstances when the parents are living apart under a temporary order or judgment of separate sup-port, following the divorce of the parents, or after the death of either or both of the parents.

[3]General Laws c. 215, § 6, provides in relevant part as follows:

"The probate and family court department shall have original and concur-rent jurisdiction with the supreme judicial court and the superior court depart-ment of all cases and matters of equity cognizable under the general principles of equity jurisdiction and, with reference thereto, shall be courts of general equity jurisdiction . . . ."

entitled to relief under G. L. c. 119, § 39D, (2) in ruling that he would not consider the plaintiff's claim because she had not alleged in her complaint that the defendant was an unfit parent, and (3) in not holding an evidentiary hearing to determine whether it would be in Adam's best interest to have visitation with Sayre.[4] We affirm the dismissal of Sayre's amended complaint, but on different grounds than those cited by the Probate Court judge.

We summarize the contents of the plaintiff's amended complaint. Because we are reviewing the allowance of a motion to dismiss a complaint, we consider "the allegations of the complaint, as well as such inferences as may be drawn therefrom in the plaintiff's favor, [which] are to be taken as true." *Warner-Lambert Co.* v. *Execuquest Corp.*, 427 Mass. 46, 47 (1998), quoting from *Blank* v. *Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404, 407 (1995).[5]

Adam, born on July 5, 1988, is the son of Aisner and his former wife, the late Anne Rogers Maurer-Shields. The couple were married on April 25, 1987, and divorced on April 21, 1989. Adam's mother was granted sole custody, and the defendant, in December of 1989, signed a waiver relinquishing all parental rights. The defendant subsequently remarried.

Adam's mother married Randy Shields in May of 1989. On July 19, 1991, when Adam was three years old, his mother was shot to death by her husband in Louisville, Kentucky. Immediately thereafter, Adam was made a ward of the State in Kentucky. Approximately one month later, Aisner withdrew his waiver of parental rights and was awarded custody of Adam.

---

[4]Sayre does not challenge the judge's ruling that, because she is not Adam's biological grandparent, she does not have standing to bring a claim under G. L. c. 119, § 39D.

We note further that the plaintiff's one-line argument that the judge's resolution of the plaintiff's constitutional claim was "wrong" does not rise to the level of appellate argument. See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). Therefore, we decline to address that issue.

[5]Sayre's amended complaint was verified and was accompanied by her affidavit, which mirrored her complaint. The father also filed an affidavit. Although it is apparent that the judge in his memorandum of decision extracted some materials from both affidavits, it is clear that his decision was based only on the facts alleged in the amended complaint.

Adam then left Kentucky to reside in California with Aisner, his wife, and their son.

Sayre has known Adam since his birth. She had been a close, life-long friend of Adam's mother and had occasionally visited Adam's parents while they were married, including at the time of Adam's birth. Adam's mother referred to Sayre as Adam's "GrandMarie."[6]

In her last will and testament, Adam's mother left her entire estate to be held in trust for Adam and named Sayre as trustee. Under the trust, Sayre, in her sole discretion, is to distribute the funds for Adam's care, maintenance, and education until Adam reaches age forty.[7]

By May of 1993, after having lived with his father for almost two years, Adam began displaying serious emotional and psychological difficulties. His condition deteriorated such that he was placed in a psychiatric hospital for forty days. After the hospitalization, and after consulting with Adam's attending psychologist, Aisner requested that Sayre authorize the expenditure of monies from Adam's trust fund to pay for Adam's admission to a full-time, round-the-clock, therapeutic boarding school. To evaluate Aisner's request, Sayre requested that Adam stay with her at her home in Arkansas for thirty days. Aisner agreed, and Adam lived with Sayre and her husband for about three months, from August of 1993 until October of 1993. Adam's behavior and emotional condition improved during his stay, and he returned to California a more normal, loving five year old boy.

Shortly after Adam's return to his father's home in California, the father moved with Adam and his family to Texas. Over the next year and one-half, Sayre visited Adam on more than twenty occasions. With the father's consent and encouragement, Sayre visited Adam at his father's home, spent numerous day outings with Adam and his stepbrother, and provided regular personal counseling and support to Adam's stepmother.

During this period, Sayre was actively involved in Adam's counseling and treatment, as well as the choice of his schooling.

---

[6]Both of Adam's maternal grandparents died before he was born.

[7]Sayre successfully defended the trust in a will contest brought by the sister of Adam's mother.

From November 1993 until May 1995, Sayre, with the permission of the father and his wife, participated in joint counseling sessions with the father, his wife, and Adam's psychologists. In that regard, the father provided Sayre with written releases for Adam's medical and educational records and gave her permission to consult with Adam's psychologists. Sayre, at various times, upon the father's request, released funds from the trust to pay for Adam's care and other expenses, including his forty-day stay at a psychiatric hospital.

In April of 1995, shortly before the father moved his family to Massachusetts, he informed Sayre by letter that there would be no future contact or visitation between her and Adam. Cards and letters sent by Sayre to Adam were returned, marked "Refused." The father has consistently denied all of Sayre's requests for visitation.

1. *Probate Court equity jurisdiction and visitation.* At the time that the judge made his decision, it was not entirely clear whether G. L. c. 119, § 39D, limited the scope of the Probate Court's equity jurisdiction. After this appeal was docketed, the Supreme Judicial Court issued two decisions which decided the issue in regard to requests for visitation by a person other than the biological grandparents of a child. In both decisions, the court stated, inter alia, that G. L. c. 119, § 39D, did not "preclude in all other circumstances an order of visitation between a child and an adult other than a legal parent. That statute does not limit the scope of the equity jurisdiction of the Probate Court." *Youmans* v. *Ramos*, 429 Mass. 774, 783 n.18 (1999). *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 828 n.4 (1999). Accordingly, it is now clear that the Probate Court has the authority to exercise its equity jurisdiction and order visitation by a person who does not have standing under G. L. c. 119, § 39D.

2. *Lack of allegation of parental unfitness.* As an alternative ground for ruling in favor of the defendant, the judge held that, because the plaintiff did not allege that the defendant was an unfit parent, he would not exercise the court's equity jurisdiction. However, in both *Youmans* and *E.N.O.*, the court ordered visitation where there was no allegation by the party seeking visitation that the parent was unfit. Both decisions specifically addressed this issue and rejected any claim that parental unfitness

must be shown before visitation can be ordered. *Youmans* v. *Ramos*, 429 Mass. at 781 n.16. *E.N.O.* v. *L.M.M.*, 429 Mass. at 832-833. Therefore, it is not necessary for a party seeking visitation to allege and prove that a parent is unfit.[8]

3. *Sufficiency of the complaint.* The plaintiff claims that her amended complaint was sufficient to require the judge to, at minimum, hold an evidentiary hearing to determine if visitation would be in Adam's best interests. Because the judge ruled that the plaintiff lacked standing to bring the complaint, he did not rule on the sufficiency of the complaint. Rather than remanding the case to the Probate Court, in the interest of judicial economy we will decide the issue.

In support of her argument, the plaintiff cites *Youmans* and *E.N.O.* However, neither case controls this matter. *Youmans* v. *Ramos*, 429 Mass. 774, involved a father who was seeking custody of his child from the child's aunt, who had been appointed the child's guardian. A trial judge granted the father custody, but also awarded the aunt certain visitation rights. *Id.* at 779. The father appealed, and the court ruled that the trial judge acted properly. The court noted that the aunt had raised the eleven year old child from infancy and had served as her guardian for six years, and had developed a de facto parent relationship with the child. *Id.* at 785.

The *Youmans* decision is not relevant, because that decision involved a custody matter in which the best interests of the child was the "controlling consideration," *id.* at 781, and because the court specifically stated that "[t]he right (or standing) of an adult who is not a legal parent to seek visitation privileges with a minor child is not at issue in this case." *Id.* at 780.

In *E.N.O.* v. *L.M.M.*, 429 Mass. 824, the court was faced with a unique fact pattern. The parties were two women who had shared a committed, monogamous relationship for thirteen years.

---

[8]The absence of an allegation by the party seeking visitation that the parent is unfit, however, is, in certain circumstances, an important factor for a judge to consider when deciding the question whether to order visitation because "there is a presumption that fit parents act in the best interests of their children." *Troxel* v. *Granville*, 530 U.S. 57, 68 (2000).

*Id.* at 825. They decided to have a family, and the defendant successfully bore a child through artificial insemination. *Ibid.* Before the child was born and again after the birth, the parties executed an agreement in which they expressly stated their intentions to coparent the child. *Ibid.* The agreement also expressed the parties' intent that the plaintiff retain her parental status even if the defendant and the plaintiff separated. *Ibid.*

After the child was born, the plaintiff assumed most of the financial responsibility for the child. *Id.* at 826. For one seven-month period, the plaintiff also assumed primary care for the child because the defendant was experiencing medical problems. *Ibid.*

After the parties moved to Massachusetts, their relationship began to deteriorate, and they separated. The defendant then denied the plaintiff any access to the child. *Ibid.* Thereupon, the plaintiff filed a complaint seeking specific performance of the parties' agreement to allow the plaintiff to adopt the child and assume joint custody. *Ibid.* She also sought visitation and, after a hearing, a judge ordered temporary visitation. *Ibid.* The Supreme Judicial Court held that the judge properly exercised his discretion in ordering such visitation.

In *E.N.O.* v. *L.M.M.*, 429 Mass. at 829, the court expressly adopted and defined the concept of a "de facto parent." The court stated that "[a] de facto parent is one who has no biological relation to the child, but has participated in the child's life as a member of the child's family. The de facto parent resides with the child and, with the consent and encouragement of the legal parent, performs a share of caretaking functions at least as great as the legal parent." *Ibid.*

The court ruled that the plaintiff was a "de facto parent" because she had participated in the child's life as a member of the child's family; the parties' coparenting agreement revealed their wish that the child continue the relationship with the plaintiff in the event that the parties' relationship ended; and the plaintiff had resided with the child and the defendant as a family. *Id.* at 830-831.

We now examine Sayre's complaint to see if it sets forth a claim for Sayre as to whether visitation should be ordered. We do so in light of our "cardinal rule . . . that the custody, care

and nature of [children] reside first in the parents." *Adoption of Vito*, 431 Mass. 550, 562 (2000), quoting from *Prince* v. *Massachusetts*, 321 U.S. 158, 166 (1944).

While the complaint shows that Sayre undoubtedly cares about Adam's welfare, she has never functioned as a de facto parent in the manner recognized in *Youmans* and *E.N.O.* Sayre's complaint certainly details much involvement in Adam's life, but such involvement did not convert her role to that of a de facto parent. For example, Sayre never resided with Adam, except for a brief three-month period when she was evaluating his need for full-time, residential treatment. Sayre, except for that three-month period, did not perform a share of the caretaking functions for Adam, but mainly discussed such issues with Adam's mother before she died, and, subsequently, with his stepmother via telephone. Sayre did not allege that she shaped Adam's daily routine or served as his moral guide. Further, in the limited manner that she provided for Adam's education and medical care, she did so, according to her complaint, in her capacity as trustee. Based upon these alleged facts, the Probate Court properly dismissed Sayre's complaint for visitation without further factual inquiry into the child's best interests. Sayre's "devotion to the child does not, without more, permit an adjudication of . . . visitation privileges." *C.M.* v. *P.R.*, 420 Mass. 220, 223 (1995).[9]

> *Order allowing motion to dismiss affirmed.*

---

[9]We also reject Sayre's argument that she needs visitation with Adam to fulfill her duties as trustee. Under the terms of the will, the trustee is prohibited from providing funds for Adam's care, support, maintenance, and education if Adam's father was appointed as his guardian. While Sayre has distributed funds to the father for Adam's care in the past, she does not allege that the father now seeks such funds. Thus, Sayre's duties as trustee consist only of managing the trust assets until Adam reaches the designated distribution age, duties that can be fulfilled without visitation with Adam.