NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

14-P-211                                            Appeals Court

ADOPTION OF ODETTA.[1]


No.  14-P-211.

Bristol.     April 9, 2015. - June 26, 2015.


Present:  Grainger, Rubin, & Blake, JJ.

Adoption, Visitation rights. Parent and Child, Adoption. Minor,
    Adoption, Visitation rights.


    Petition filed in the Bristol County Division of the
Juvenile Court Department on March 30, 2009.

    The case was heard by Robert F. Murray, J.


    Afton M. Templin (Belle Soloway with her) for the father.
    William Cuttle, Assistant Attorney General, for Department
of Children and Families.
    David Jonathan Cohen for the child.


    BLAKE, J.  In a case of first impression, we determine that

under the limited circumstances present in this case, it is in

the best interests of the child to enjoy postadoption visitation

---

[1] A pseudonym.

with a relative who is neither a de facto parent, sibling, or grandparent.

The father and the mother were the unmarried parents of Odetta, born in September, 2005.  The father and the mother separated when Odetta was an infant.  While Odetta lived with her mother, the father and his brother (the paternal uncle) assisted in raising her, including attending doctor appointments.  The father and the mother did not have a formal parenting schedule, but Odetta spent time with her father and his wife, as well as with the paternal uncle and his family.  Odetta also spent time with the mother's extended family.

In March, 2009, the mother was found strangled to death.  Three days later, the father was charged with and ultimately convicted of her murder.[2]  The Department of Children and Families (department) placed Odetta with her maternal aunt and uncle.  It then sought to terminate the father's rights and place Odetta for adoption with her maternal aunt and uncle.  Initially, the father filed a guardianship petition requesting that the paternal uncle be appointed Odetta's guardian.

---

[2] The father was later charged with and convicted of first degree murder.  The conviction was affirmed on appeal.

Thereafter, the paternal uncle, a Muslim, petitioned for guardianship of Odetta.[3]

Following a lengthy trial over multiple days, a judge of the Juvenile Court terminated the father's parental rights, approved the department's plan for placement of Odetta, and ordered monthly visitation between the paternal uncle and Odetta. The visitation order was largely based on a determination that Odetta's best interests will be served by allowing "her to have some contact with her father's family, the tenets and practices of Islam which are part of her family heritage and which the adoptive family, who are not Islamic, cannot or will not provide for her."

The father, Odetta, and the department now appeal. The father asserts the adoption plan approved by the judge is not in the best interests of Odetta because, among other things, it attenuates her ties to the paternal uncle and her Muslim heritage.[4] Odetta and the department challenge the judge's authority to order postadoption contact with the paternal uncle. We affirm.

Discussion. 1. Competing adoption plans. A trial judge's ruling on competing adoption plans is entitled to substantial

---

[3] The paternal uncle did not pursue adoption because it is not recognized by his religion.

[4] The father does not contest the judge's finding of unfitness.

deference and will not be reversed in the absence of an abuse of discretion. Adoption of Inez, 428 Mass. 717, 720 (1999). When alternative plans are presented, the trial judge must choose the plan that is in the child's best interests after an "even handed" assessment of all the facts surrounding both plans. Adoption of Hugo, 428 Mass. 219, 226 n.8 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999).

Here, the judge's conclusion that it is in Odetta's best interests to be placed permanently with the maternal aunt and uncle, rather than with the paternal uncle, is amply supported by the record. The judge entered extensive findings of fact,[5] and found that Odetta was thriving under the care of her preadoptive family and that, for the past three years, all of her essential needs have been met.[6] He balanced Odetta's need for stability and the possible trauma of removing her from her preadoptive home. See Adoption of Hugo, supra at 227-229. The judge did not credit the father's argument that the maternal aunt and uncle did not appreciate Odetta's need for therapy. In light of the foregoing, the judge's conclusion that permanent

---

[5] The judge entered ninety-four findings of fact and twenty-six conclusions of law, which also included findings of fact.

[6] The judge found that Odetta was up to date medically, she was surrounded by extended family, her educational needs were being met, she was well adjusted both in school and socially, and she was, as described by her therapist, "a happy child."

placement with the preadoptive family would be best for Odetta did not constitute an abuse of his considerable discretion.

2. Postadoption visitation. A judge's authority to order postadoption visitation is rooted in his broad equitable powers and conditioned upon a finding that visitation is in the child's best interests. See Adoption of Vito, 431 Mass. 550, 557-558 (2000); Matter of Moe, 385 Mass. 555, 561 (1982). Our decisional law has addressed visitation under related circumstances, but has yet to address an order of visitation with an individual other than a biological parent or sibling, former guardian, de facto parent, or grandparent. Nonetheless, these cases provide guidance on the issue before us. In Youmans v. Ramos, 429 Mass. 774 (1999), for instance, the court affirmed the trial judge's sua sponte order of visitation between the child and his former guardian, an aunt, in a guardian termination proceeding granting custody to the father. The court did not specifically address whether a non-legal parent has the right to affirmatively seek visitation, but reaffirmed that such a question is to be left to the sound discretion of the trial judge. Id. at 780-783 ("although there is no statutory authority for postadoption visitation, the 'broad equitable powers' of courts in this area permit a judge, in his discretion, to evaluate a proposed adoption plan providing for such visitation and to decide whether visitation is in the

child's best interests"), quoting from Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption, 392 Mass. 696, 702-703 (1984).

In E.N.O. v. L.M.M., 429 Mass. 824 (1999), the court adopted and defined the concept of a "de facto parent" and the rights and obligations flowing from such a designation, in affirming an order of temporary visitation with the birth mother's former partner.[7]  Id. at 829.  E.N.O. is instructive in that it recognizes the broad equity power of a judge to protect a child's best interests, including maintaining contact with a de facto parent.  Id. at 827-828.

The plaintiff in Sayre v. Aisner, 51 Mass. App. Ct. 794, 795 (2001), alleged that she was a "surrogate grandmother" entitled to visitation with the minor child under G. L. c. 119, § 39D.[8]  The dismissal of the plaintiff's complaint for lack of standing was upheld on appeal.  Nevertheless, this court recognized that the Probate and Family Court has authority to exercise its equity jurisdiction to order visitation with a

---

[7] Here, the father does not contend, and the record does not support, a conclusion that the paternal uncle was the de facto parent of Aisha.

[8] "General Laws c. 119, § 39D, grants the grandparents of an unmarried minor child reasonable visitation rights under certain circumstances when the parents are living apart under a temporary order or judgment of separate support, following the divorce of the parents, or after the death of either or both of the parents."  Sayre v. Aisner, supra at 795 n.2.

person who otherwise lacks standing under the grandparent visitation statute.  Id. at 798.

The judge relied, in part, on Sayre in exercising his equitable authority to enter the visitation order in this case. We agree that a judge's equitable authority to order visitation is not limited to a certain category of persons, as the department and the child suggest, but may extend to situations, such as the one present here, where the judge has found continuing contact to be in the child's best interests.[9]  See Adoption of Vito, 431 Mass. at 553 (postadoption contact may be warranted where there is a compelling reason, and such contact is in the child's best interests).

Here, the judge concluded that, in the particular set of circumstances presented, the "preservation of both religions/cultures" to which Odetta had been exposed was fundamental to her development and in her best interests.  Upon her birth, Odetta was given a Muslim name, and the family took part in a ceremony in which she was formally recognized into the

---

[9] Without citing authority to support its proposition, the department and the child argue, in essence, that we are limited by the case law as it stands.  The absence of statutory language or specific case law governing the unusual circumstances present in this case does not preclude a judge from entering an order that it determines to be in the child's best interests.  See Matter of Moe, 385 Mass. at 561 ("Our Probate Courts . . . [possess] inherent powers apart from statutory authorization. These powers are broad and flexible, and extend to actions necessary to afford any relief in the best interests of a person under their jurisdiction").

Muslim faith.[10]  Odetta attended the same mosque as the paternal uncle from her infancy to age three, when, at the time of her mother's death, she was placed with her maternal aunt.  Prior to this time, Odetta sporadically attended a Christian church[11] with her mother and, on occasion, with her father as well.  At the time of the mother's death, Odetta's parents had not chosen one religion or culture for her but, instead, chose to expose her to both religions and cultures.  The paternal uncle is the sole family member available and able to continue to expose Odetta to a culture and religion that was an integral part of her life until the mother's untimely death.

We agree that, where supported by a record of purposeful exposure to both parents' religions and cultures, and in the absence of evidence of harm to the child, continuing that exposure may be in a child's best interests.  See Felton v. Felton, 383 Mass. 232, 233-234, 239-241 (1981).  In Felton, the court examined the exposure of children to the religions of their parents in the context of divorce, noting that our "law sees a value in . . . contact with the parents' separate religious preferences. . . .  And it is suggested, sometimes,

---

[10] Her name has cultural significance in the Muslim community.

[11] The mother and her family are Seventh Day Adventists. Odetta continues to attend church regularly with her maternal aunt and uncle.

that a diversity of religious experience is itself a sound stimulant for a child."  Id. at 234-235.  The Felton court accordingly held that, absent detailed demonstration of harm to the children, the limitations imposed upon the father's religious instructions or practices were not justified.  Id. at 234, 239-240.  See Kendall v. Kendall, 426 Mass. 238, 243, 248-249 (1997).

The judge also ordered visitation with the paternal uncle "in order to preserve the child's relationship with her paternal aunt and uncle" in light of the "inherent if latent animosity between the maternal family and the paternal family."  Given the unusual and tragic nature of this case, the judge's order makes sense.  The paternal uncle has been a part of Odetta's life since birth, and has attended many milestone events, including her first three birthdays.  Prior to the mother's death, the paternal uncle would take Odetta once or twice a month, usually to the mall to buy her clothes and toys.  At times, Odetta also spent the night at the paternal uncle's home, and the paternal uncle would watch Odetta while the mother was at work.  After the department became involved with the family, the paternal uncle continued to visit with Odetta.  At first Odetta was reluctant, but she quickly grew comfortable with monthly visits that began as supervised, and transitioned to unsupervised, all without incident.  Moreover, in spite of any understandable

discord between the maternal and paternal families,[12] the maternal aunt and uncle testified that, if allowed to adopt Odetta, they would be open to permitting the paternal uncle to visit. Indeed, the maternal uncle conceded that "it [is] probably in [Odetta's] best interest" to maintain a relationship with the paternal uncle.

In the ordinary case, the adoptive parents must be relied upon to ensure that the child is exposed to her ethnic and religious heritage, and to make certain, where appropriate and permitted, that there is continued contact with the child's biological extended family. While all parents, including adoptive ones, are presumed to act in the best interests of their children, Blixt v. Blixt, 437 Mass. 649, 658 (2002), the judge found that a court order was necessary in this case to insure that Odetta's best interests are met. The order is narrowly tailored and not intended to interfere with the adoptive parents' ability to raise Odetta. We do not deem such an order to be an abuse of the judge's broad discretion.

Judgment affirmed.

---

[12] As Christmas of 2012 approached, the maternal uncle cancelled one of the paternal uncle's visits with Odetta, due to the apparent distrust between the families.