The mother appeals from a decree by a judge of the Juvenile Court terminating her parental rights to her son, Hiroshi, and declining to order posttermination and postadoption visitation.[3] She argues that several of the judge's findings of fact are clearly erroneous and that the judge failed to adequately consider positive evidence of her ability to parent Hiroshi. She also contends that the judge abused his discretion in rejecting her proposed placement plan for Hiroshi. We affirm.
Background. We summarize the relevant facts as set forth in the judge's decision and as supported by the evidence. Hiroshi was born in July, 2013. At that time, the mother and the father were in a volatile relationship.[4] The Department of Children and Families (department) became involved with Hiroshi in April, 2014, as a result of a G. L. c. 119, § 51A, report alleging that the mother and the father were arguing over the presence of a friend in the house who was using heroin.[5] The allegations were supported, after which Hiroshi was removed from the home and placed in foster care. The department filed a care and protection petition and was awarded temporary custody.
The department arranged for weekly visits between the mother and Hiroshi beginning in June, 2014. Initially, the visits went well and the mother brought appropriate toys, snacks, and clothes for Hiroshi and, as a result, visits were increased. However, within one year's time, the mother's visits became increasingly less successful, and she missed eight visits with Hiroshi between July, 2015, and January, 2016. She had only one visit with Hiroshi between March, 2016, and October, 2016. During this time, the mother's relationship with the department deteriorated. For example, after one supervised visit at the mother's apartment in September, 2015, during which the social worker became alarmed due to the odor of gas (it was discovered that the mother had turned on the stove without igniting it), the mother claimed nothing was wrong and then threatened the social worker.
At the same time, the mother's mental health declined, and she was hospitalized involuntarily and voluntarily on three occasions in early 2016, including once for attempted suicide. The mother was diagnosed with schizoaffective disorder bipolar type, depression, posttraumatic stress disorder, and stable mood. The mother also had difficulty maintaining stable housing after February, 2016, and was essentially homeless at the time of trial.
The trial was scheduled to commence on August 10, 2016, and was continued to August 17, 2016. However, the mother did not appear. She claimed, through counsel, that she was ill as a result of having suffered a concussion. The mother was present for the next scheduled trial date, October 17, 2016. She also was present on the second day of trial, October 18, 2016. The case was continued to October 25, 2016, at which time the mother was scheduled to resume her direct testimony and be cross-examined, but she did not appear. After discussion with the mother's attorney, the judge proceeded with the trial in the mother's absence. The judge ruled that if the mother wanted to complete her testimony, she could file a motion to reopen the evidence on or before November 25, 2016, but she did not file such a motion or seek to be heard further.
Discussion. 1. Alleged erroneous findings. The mother challenges four of the judge's findings of fact, numbers 26, 98, 109, and 110, as clearly erroneous. Our review of the record reveals that three of those challenged findings, numbers 98, 109, and 110, are supported by the evidence. The remaining challenged fact, number 26, contained only immaterial errors not central to the ultimate finding of unfitness.
In finding number 26, the judge addressed the mother's relationship with her boy friend, Brian.[6] Although this finding contains minor discrepancies about the relationship and the circumstances surrounding the mother's departure from Brian's home, these errors were not central to the ultimate issue of unfitness and were immaterial. More importantly, even without this fact, there was ample support for the ultimate finding of unfitness. Care & Protection of Olga, 57 Mass. App. Ct. 821, 824-825 (2003).
In finding number 98, the judge stated that the mother failed to provide adequate written verification for medical treatment, which she alleged prevented her from appearing for trial in August. The mother's challenge to this finding fails. First, the judge did not find that the mother had submitted no documentation of the injuries that led to her concussion; the mother is correct that she provided a Signature Healthcare report. However, the judge determined that the report was not sufficient to excuse the mother's absence from court. The judge's conclusion in this regard is supported by the record.
Findings numbers 109 and 110 concern the mother's progress in completing tasks on her service plan. The judge found that the mother had "not made any progress towards ... any of her tasks on her service plan," and that "in the 8-10 months preceding this trial Mother made no progress towards any of the tasks on Mother's service plan." Contrary to the mother's claim, both findings are supported by the record. The department social worker testified that the mother failed to meet with the department monthly after late 2015. The mother missed a significant number of visits with Hiroshi. She had not seen a psychiatrist for some time prior to the trial and was not consistent in meeting with her counsellor. The judge was entitled to credit this testimony. See Adoption of Rhona, 63 Mass. App. Ct. 117, 125 (2005).
The mother correctly contends that she made partial progress toward some tasks, for example, those requiring her to sign releases of information to allow the department to have open discussions with her medical professionals and to maintain stable housing. However, it was within the judge's discretion to determine that the mother's failure to complete some of the tasks amounted to insufficient overall compliance with the service plan. Where a judge makes one of several possible choices of what facts are supported by the evidence, that choice is not clearly erroneous. Guardianship of Jackson, 61 Mass. App. Ct. 768, 774 (2004).
2. Ultimate finding of unfitness. The mother argues that if the clearly erroneous findings are not considered, the evidence merely shows homelessness and mental illness, and not any "grievous shortcomings or handicaps ... which place the child at serious hazard." Petition of Boston Children's Serv. Ass'n to Dispense with Consent to Adoption, 20 Mass. App. Ct. 566, 567 (1985). We disagree.
The judge found that the combination of the mother's "mental health issues, her instability and lack of [a] stable home for herself and the subject child; Mother's failure to consistently engage in services, consistently visit with the subject child, and consistently cooperate with the [department]" together constituted her unfitness. While homelessness and mental illness alone do not constitute unfitness, see Adoption of Quentin, 424 Mass. 882, 888-889 (1997) ; Adoption of Virgil, 93 Mass. App. Ct. 298, 303 (2018), the judge appropriately considered these factors in light of his other findings, namely, the mother's failure to obtain regular, consistent mental health treatment, complete certain service tasks, and attend visits with Hiroshi. The rationale for the judge's ultimate finding, therefore, was not based solely on the mother's struggle to obtain stable housing or on her mental illness, but on how these factors impacted her ability to care for Hiroshi and "on a constellation of [other] factors that pointed to termination as being in the best interests of the child." Adoption of Greta, 431 Mass. 577, 587-588 (2000).
More fundamentally, the mother's mental health issues were relevant to the judge's finding of unfitness because, as the judge stated, they "have impacted her parenting ability" and prevented "her from providing a stable home environment for [Hiroshi]." See Adoption of Rhona, 63 Mass. App. Ct. at 125. In addition, as the judge further observed, "[the mother's] mental health issues continued to appear to grow worse."
Furthermore, contrary to the mother's argument, the judge did not ignore evidence of her positive gains, as evidenced by the judge crediting the mother's success in addressing her substance abuse issues. The judge also acknowledged that the mother ended the volatile relationship with the father. These positive gains, however, did not outweigh the mother's shortcomings at the time of the trial. See Adoption of Paula, 420 Mass. 716, 728-730 (1995).
3. Posttermination and postadoption visitation. The judge concluded that posttermination and postadoption visitation with the mother was not in Hiroshi's best interests. The mother claims that the judge abused his discretion in this regard when he ordered posttermination and postadoption visitation for the father pursuant to the terms of his agreement with the department, see note 2, supra, and approved the department's adoption plan, which included visits with the maternal grandmother and current foster family.[7]
Once it is established that a parent is unfit, the decision whether to grant posttermination or postadoption visitation is left to the sound discretion of the trial judge. Adoption of John, 53 Mass. App. Ct. 431, 439 (2001). The decision must be grounded in the best interests of the child. Adoption of Terrance, 57 Mass. App. Ct. 832, 839 (2003). An order for posttermination or postadoption visitation is not warranted in the absence of a finding that a significant bond exists between the child and a biological parent and that continued contact is currently in the best interests of the child. Adoption of Vito, 431 Mass. 550, 563-564 (2000).
Here, the judge determined that posttermination and postadoption visits with the mother would not be in Hiroshi's best interests. Hiroshi has not lived with the mother since he was eight months old. Although many of the visits between the mother and Hiroshi were successful in the beginning, later, as the judge observed, "[the mother] only had two visits in the nine (9) months prior to trial," and there was "no evidence of any bond between Mother and Hiroshi." The mother did not have "significant or consistent contact with [Hiroshi] since 2015." These findings support the judge's determination that there was no substantial bond between the mother and Hiroshi. In contrast, Hiroshi had developed a bond with the maternal grandmother and with his foster family. Given these circumstances, we discern no abuse of discretion in the judge's visitation order. See Adoption of Betsy, 69 Mass. App. Ct. 907, 909 (2007).
4. The mother's proposed plan. Finally, the mother claims that it was error for the judge to reject her proposed plan for Hiroshi to be placed in a guardianship with the maternal grandmother. A judge's ruling on competing placement plans is entitled to substantial deference and will not be reversed in the absence of an abuse of discretion. Adoption of Odetta, 87 Mass. App. Ct. 576, 577 (2015). When alternative plans are presented, the judge must choose the plan that is in the child's best interests after an "even handed" assessment of all the facts surrounding both plans. Id.
Here, the judge's findings demonstrate that he thoroughly considered the mother's proposed plan to place Hiroshi with the maternal grandmother and the department's plan to recruit a preadoptive family. At the time of trial, the maternal grandmother was seventy-one years old and lived in a one-bedroom apartment, although she had been on the waiting list for a two-bedroom apartment for two years prior to trial. The mother's older son, Kevin, lived with the maternal grandmother and slept on her couch. There was evidence that Kevin had a history of mental health issues. The maternal grandmother testified that Kevin planned to move in with a friend, but she was unable to provide a plan for him if that arrangement fell through. In sum, the maternal grandmother did not have a suitable home for Hiroshi. In addition, the judge questioned the maternal grandmother's ability to comply with his visitation order and restrict the mother's access to Hiroshi. Given Hiroshi's age (three years old at the time of trial), the judge found that the department's plan to seek a permanent preadoptive home that would permit ongoing contact with the maternal grandmother best met his long-term needs. The judge's decision reflects the requisite careful consideration of the facts surrounding each plan and Hiroshi's best interests, and accordingly, we discern no error. See Adoption of Lars, 46 Mass. App. Ct. 30, 31-33 (1998).
Decree affirmed.

The father stipulated to the termination of his parental rights and waived his rights to appeal. He entered into an agreement with the Department of Children and Families for posttermination and postadoption visitation with Hiroshi.

The mother reported that the father abused her physically and emotionally. At different points in their relationship, both the mother and the father were arrested for domestic violence. The mother ended her relationship with the father in October, 2014.

The mother had a prior history with the department involving her first child, Kevin (a pseudonym). Kevin was born when the mother was twenty-five years old; his father is not the father of Hiroshi. As a result of numerous incidents, including physical abuse of Kevin by the mother's boy friend, the department obtained custody of Kevin.

A pseudonym.

We note that the judge's order includes posttermination and postadoption visitation only with the father, consistent with the terms of his agreement with the department, but does not contain any order for visitation with the maternal grandmother or the current foster family. The judge found that the department is "looking for a family who is open to [Hiroshi] maintaining a relationship with maternal grandmother, [and] his foster family," consistent with the department social worker's testimony. The department's plan does not reflect this intention, however.