## ADOPTION OF AZZIZA.[1]

No. 10-P-441.

Plymouth. June 10, 2010. - August 12, 2010.

Present: KANTROWITZ, KATZMANN, & HANLON, JJ.

*Adoption,* Care and protection, Dispensing with parent's consent. *Minor,* Adoption, Care and protection. *Parent and Child,* Adoption, Care and protection of minor, Dispensing with parent's consent to adoption. *Practice, Civil,* Assistance of counsel.

In a proceeding to dispense with parental consent to adoption, the father received ineffective assistance of counsel, requiring a new trial, where the behavior of the father's counsel fell measurably below that which might be expected from an ordinary fallible lawyer, in that counsel did not attempt to refute with available witnesses the evidence of the father's unfitness, which, while sufficient, was not overwhelming, and thereby prejudiced the father in his defense. [368-370]

PETITION filed in the Plymouth County Division of the Juvenile Court Department on April 25, 2008.

The case was heard by *John P. Corbett,* J.

*Ann Balmelli O'Connor* for the father.

*Kiernan E. Joliat,* Assistant Attorney General, for Department of Children and Families.

*Daniel R. Katz* for the child.

KANTROWITZ, J. In this case, the ineffectiveness of counsel constrains us to reverse a decree adjudicating the father as unfit and terminating his parental rights.

Following the trial where his parental rights were terminated, the father unsuccessfully moved for a new trial on the basis of ineffective assistance of counsel, claiming that his attorney failed to prepare for trial or file proposed findings of fact, and failed to call witnesses on his behalf, including several who

[1]A pseudonym.

were available to testify at the hearing. On appeal he argues the same in addition to claiming insufficiency of the evidence.

*Facts.* The child was born in July of 2006 to unmarried parents. Due to ongoing safety concerns, the Department of Children and Families (DCF) became involved, ultimately seeking to terminate the parental rights of the mother and father. On or about May 15, 2008, the child was placed in what would turn out to be her preadoptive home with her paternal uncle and aunt, the brother and sister-in-law of the father.

On the first day of trial, June 16, 2009, the father requested new counsel, claiming his attorney had not prepared him or spoken to any potential witnesses who were willing and available to testify on his behalf. When the judge asked for a response to the father's assertion, father's counsel replied, "I have spoken to witnesses. I have summonsed people in."[2] The judge denied the father's request, responding that "[t]here's no way I can possibly have an attorney withdraw at this late date."

At trial, witnesses for DCF and the child offered testimony regarding the unfitness of the parents. Cutting to the chase, there is no question that the mother, who has not filed an appeal, was unfit. The mother has chronic drug and alcohol abuse problems and a history of leaving the home for days at a time while out abusing substances. Despite repeated attempts at treatment, she has been unable to remain sober and drug free and has repeatedly failed to comply with her DCF service plan, including the requirement to complete an inpatient substance abuse program.

On October 9, 2006, a report pursuant to G. L. c. 119, § 51A (§ 51A report), was filed, alleging neglect of the child based on the mother's substance abuse and an incident where drug dealers threatened the mother in the home while the child was present. As a result, DCF filed a care and protection petition and temporarily took custody of the child until the seventy-two hour hearing, following which the father regained custody. The mother entered a nine-month treatment program, but left after six months and relapsed shortly thereafter.

On April 24, 2008, another § 51A report was filed following a verbal and physical fight between the mother and father. At the time of the incident, the father acknowledged that he had

---

[2]According to the affidavit from the father's appellate counsel, the father's trial counsel summonsed the father's friend, who did not appear for trial.

left the child with the mother, who had been drinking. On April 25, 2008, DCF took custody of the child following a report by the father that the mother had been suicidal in the past month and was mentally unstable.[3] The judge concluded that the mother's "prognosis for her mental health and for remaining drug and alcohol free is extremely poor."[4]

The father's unfitness, while warranted by the evidence at trial, is a closer question. From the beginning of their relationship, the father was aware of the mother's substance abuse, yet continually left the child alone in her care despite admonitions from DCF not to do so. DCF had ongoing concerns about the father's continued contacts with the mother and the extent to which his relationship with the mother took priority over his relationship with the child; there was also concern about the father's "enabling behavior towards [the mother]."[5]

Additionally, the judge found that the father's "unemployment is chronic," that he "no longer has a place of his own and will be staying with family," and that "[h]e has always abdicated

[3]The father had previously reported an incident where the mother attempted to jump out of a moving vehicle while intoxicated; he also stated that the mother was on medication for her mental health issues. The mother failed to comply with the portion of her DCF service plan requiring her to "engage in mental health counseling to address her history of suicidal ideation and any other issues deemed necessary" and to "complete a psychological evaluation to reflect emotional/cognitive testing and provide [a] report to [DCF]."

[4]Among the litany of factors contributing to the mother's unfitness, the judge noted that she had been arrested four times. The most recent was for a charge of assault and battery against the father. At the time of trial, she was on probation pending completion of a substance abuse program. The judge also found that the mother did not have custody of her five other children, fathered by at least four different men. In 2004, one of the fathers was granted guardianship of four of the children; the mother's parental rights to her fifth child were terminated in 2007 as a result of neglect stemming from her substance abuse and a violent incident in the home.

[5]A DCF social worker testified that the father would regularly leave the child in the mother's care for a few hours in the morning while he went to work. The social worker also testified regarding the ongoing interaction between the father and mother, noting that the father used his cellular telephone to call the mother during a DCF visit with the child, and that on November 13, 2008, he and the mother went to the DCF office *together* to notify DCF that they were no longer in a relationship or living together. The father acknowledged that on February 20, 2009, the mother went to his home, and as late as April of 2009, at the foster care review, the Father "appeared to be advocating on behalf of Mother . . . [and] would answer for Mother when she was asked why she did not do certain tasks [on her service plan]."

the day to day care of [the child] to others."[6] The foster mother testified that a car seat provided to them by the father was not functional and that the child's clothes were in poor condition. The foster father testified that the father's behavior during visits with the child was inappropriate, that the father encouraged the mother's alcoholism, and that the father indicated he was willing to sign custody of the child over to the foster parents as long as DCF was not involved.

Father's counsel did little to counter such testimony, notwithstanding a plethora of favorable evidence available to her. During trial, father's counsel received a parent evaluation report from DCF that reflected favorably on the father's parenting skills and his behavior when interacting with the child.[7,8] Counsel failed to obtain the evaluator's testimony or even attempt to have the contents of the report admitted in evidence.

Additionally, trial counsel did not call the father's therapist as a witness. The father began seeing a licensed mental health counsellor in May of 2008. According to her affidavit, the therapist would have testified that she had "no real concerns about [the father's] ability to parent his [child]," that he was not control-

---

[6]The judge also noted that the father's "lifestyle consists of volatile relationships with various women" and that the father has three additional children, all by different women. On separate occasions, the father "used a BB gun to attack a former girlfriend (and mother of one of his children) and Mother when they did things he did not approve of. He was arrested and charged with assault and battery as a result of another fight with a different girlfriend." The judge found that the father had been arrested eight times since 1986, but has no open cases.

[7]It is unclear whether father's counsel received the report on the first or second day of the two-day trial.

[8]DCF referred the father to a counselling center for a parenting evaluation. According to that evaluation, the father responded "remarkably well" to situational assessments; "[t]here were no concerns regarding any of the answers given." In regard to the father's interactions with the child, the evaluation noted that a "visit went very well, and there were no concerns seen by this writer." Other favorable clinical impressions included: "It appears that [the father] understands the specifics about taking care of his child. . . . [The father] understands right from wrong, is willing to meet the needs of his [child], and is aware of having to follow his service plan as outlined. [W]ith continued adherence to the DCF service plan as outlined and help of [a] parent aide, [the father] should successfully be able to meet the demands of parenting a child with medical needs." As the record indicates that the child is otherwise healthy, we interpret the phrase "a child with medical needs" to mean a child in need of care as a result of a typical childhood illness or injury.

ling of women, and that she was not concerned about his living situation.

Lastly, and perhaps most significantly, counsel failed to call five of the father's relatives as witnesses, despite the fact that four of them were present during the trial (with a fifth being on call) and that the father wanted them to testify on his behalf.[9] The father's aunt, a twenty-year employee of the Harvard School of Public Health, would have testified that when the child lived with the father, she was always clean and well-cared for and that the foster parents misrepresented the father's relationship with the child. His sister would have testified as to the instability within the home of the foster family.[10] The father's mother, also the mother of the foster father, would have testified that the child "always appeared well-cared for" by the father and that the foster father misrepresented his knowledge of the relationship between the parties.[11,12]

On September 21, 2009, the Juvenile Court judge issued decrees terminating the father's and mother's parental rights. On December 21, 2009, the father filed a motion seeking a new trial on grounds of ineffective assistance of counsel, claiming that trial counsel failed to prepare for trial and present witnesses. The Juvenile Court judge denied the motion in an order and memorandum of decision issued on February 3, 2010, following an apparently nonevidentiary hearing on January 6, 2010.[13]

[9]The father's mother, grandmother, uncle, and aunt were present at the courthouse, and his sister had arranged her schedule so that she could have come to the courthouse. His sister's affidavit states that she communicated with the father's attorney by telephone prior to trial and offered to testify on the father's behalf.

[10]Specifically, the sister would have testified that the foster father, also her brother, and the foster mother were planning to divorce and that the foster father planned to stay in the marriage just until the adoption of the child was complete.

[11]The father's mother stated that in the father's care the child "was clean, . . . smiling and playful" and that the apartment where the father and child previously lived was "clean and uncluttered." She also stated that her son "was a doting father" and was "loving and gentle in his interactions with [the child]," who responded in kind.

[12]Of less significance, but demonstrative of an over-all pattern of ineffectiveness, counsel never filed any findings of fact to counter the joint proposed findings filed by DCF and the child in response to the judge's order for proposed findings.

[13]Appellate counsel's affidavit reveals a continuing pervasive lack of effort,

In his memorandum denying the motion, the judge noted that while trial counsel "could have been more energetic in her defense," the affidavits from family members "contain little of substance and seem aimed primarily at bolstering father[']s rather doubtful, credibility and undermining the credibility of the foster parents." He concluded that "[n]othing in the affidavits serve to undermine the reliability of the essentially undisputed evidence that although [the father] is capable of the biological acts necessary for fatherhood, he has never acted as a parent for any of his children and has maintained a rootless life of marginal employment, unstable housing, and dependence on others for his own support, shelter and care of his children."

Further, the judge determined that the proposed testimony by the father's therapist and the parent evaluator would have been irrelevant to the outcome, concluding that the evaluator's "report is superficial at best and is almost exclusively based on [the father's] self reports."

*Ineffective assistance of counsel.* On the question of ineffective assistance of counsel, "[f]irst, we look to determine whether the 'behavior of counsel [fell] measurably below that which might be expected from an ordinary fallible lawyer' and, if so, we further inquire 'whether [counsel's conduct] has likely deprived the defendant of an otherwise available, substantial ground of defence.' " *Care & Protection of Stephen,* 401 Mass. 144, 149 (1987), quoting from *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). *Adoption of Yvette (No. 1),* 71 Mass. App. Ct. 327, 345 (2008). Under the second prong, prejudice must be shown; prejudice is not shown if there is overwhelming evidence of unfitness. *Adoption of Holly,* 432 Mass. 680, 690 (2000). *Care & Protection of Georgette,* 439 Mass. 28, 33-34 & n.7 (2003). Lastly, "[w]here a strategic choice is at issue, '[a]n attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made.' " *Adoption of Yvette (No. 1), supra,* quoting from *Commonwealth* v. *Martin,* 427 Mass. 816, 822 (1998).

---

this time in trial counsel's failure to cooperate with appellate counsel. Trial counsel failed to mail appellate counsel the requested documents and generally failed to return telephone calls, responding only twice to multiple messages. In response to appellate counsel's request for an affidavit for the motion hearing, trial counsel was entirely unresponsive.

Here, both prongs of the standard were met. The failure to interview witnesses and have them testify demonstrated behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer.[14] See *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 4 (1979) (finding that marshaling of evidence by counsel helps ensure that courts reach decisions on parental rights with "utmost care"). As for the second prong, simply, the evidence of unfitness, while sufficient, was not overwhelming.

The judge reached his decision without "an extra measure of evidentiary protection," that would have existed had the father's trial counsel attempted to refute DCF's evidence with the available witnesses. See *ibid.* Indeed, trial counsel was unaware of the father's aunt, who was prepared to provide supportive testimony and had attempted to relay this information to trial counsel in person but was rebuffed. With respect to the father's parenting skills, trial counsel completely ignored the DCF parenting evaluation that reflected favorably upon the father's ability to parent the child.

Trial counsel also failed to marshal evidence favorable to the father concerning the father's relationship with the mother and the extent to which the child's interest was best met by placement with the foster parents. Multiple witnesses would have testified regarding the lack of an ongoing relationship between the father and mother, his fitness as a parent, and the instability of the foster parents' marriage. Trial counsel let valuable witnesses and evidence sit silent, contravening in a meaningful way the judge's conclusion that the best interests of the child were served by her placement with the foster parents. Contrast *Adoption of Holly*, 432 Mass. at 691. While the father was not entitled to a defense free of mistakes, *Delle Chiaie* v. *Commonwealth*, 367 Mass. 527, 536 (1975), he was entitled to the effective assistance of counsel, which he did not receive here.

---

[14]To the extent the decision to avoid calling the relatives to testify may have been reflective of trial strategy, it was manifestly unreasonable. See *Adoption of Rhona*, 63 Mass. App. Ct. 117, 130 (2005). Trial counsel could not have made a reasonable tactical decision regarding the testimony of the family members and the therapist without first conducting interviews with them, which did not occur. See *Commonwealth* v. *Baker*, 440 Mass. 519, 529 (2003) ("Until [counsel] commenced such an investigation, [counsel] simply had no way of making a reasonable tactical judgment").

*Conclusion.* The judge was placed in a difficult position by having the father, on the morning of trial, indicate a not uncommon dissatisfaction with counsel. Perhaps by further ferreting out the reasons for the dissatisfaction, the judge would have been in a better position to determine an appropriate remedy, if any. Here, the judge was kind in his assessment that counsel "could have been more energetic in her defense." In fact, the father's counsel not only fell "measurably below that which might be expected from an ordinary fallible lawyer," but also prejudiced the father in his defense. See *Care & Protection of Georgette*, 439 Mass. at 33. As such, a new trial is mandated. We do not intimate at all the result of that new proceeding.[15]

> *Order denying motion for new trial reversed.*

---

[15]There was no suggestion at oral argument that the trial judge was anything but fair. As such, there is no need, nor was there a request, that another judge hear the matter. We are convinced that the judge, at the new trial, will continue to be open-minded, fair and thorough.

We are not, however, as charitable to the performance of counsel, whose conduct is highly troubling. As she was court-appointed, we are referring this matter to the Committee for Public Counsel Services in the hope that such shortcomings will be addressed.