NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-821

ADOPTION OF NASSER.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree of a Juvenile Court judge finding her unfit to parent her son Nasser and terminating her parental rights.  The mother challenges the determination of unfitness and argues that several of the judge's findings are clearly erroneous.  We affirm.

Background.  The mother has been involved with the Department of Children and Families (department) since 2001. Nasser is not the mother's only child; she has several older children that were no longer in her care at the time of trial, as a result of separate care and protection actions in 2005 and 2014.  Both prior petitions were motivated, in part, by the department's concerns over neglect, exposure to physical and sexual abuse, mental health problems, inadequate housing, and domestic violence.

_____

[1] A pseudonym.

The child was born in June 2015.  He spent his first three years in the mother's care; he has had no contact with the father.[2]  The department filed the instant care and protection petition in December 2018 (when the child was three) due to concerns that the mother was not adequately supervising the child, had ceased services for the child despite his ongoing needs, and had allowed her eldest son, Brian,[3] access to the child despite allegations that Brian had sexually assaulted his younger sister, Mary (another of the mother's children).  The department was granted temporary custody of the child on December 21, 2018.  In October 2019, the department changed the child's permanency goal from reunification to adoption.  In October of 2021, the father separately agreed to the termination of his parental rights to the child.  After an eight-day trial between October 2021 and June 2022, the mother was found to be unfit and her parental rights were terminated.  This appeal followed.

We summarize the judge's key findings, which address multiple areas of concern.

---

[2] Nasser's father is also the father of some, but not all, of the mother's older children.  We refer to him as "the father" throughout this decision.

[3] The names of the older children are also pseudonyms.

1.  Domestic violence.  The mother has been in several relationships involving domestic violence since her first involvement with the department in 2001.  Several of the mother's previous partners physically and emotionally abused both the mother and her children.  The mother's relationship with the father was marked by severe domestic violence, often perpetrated on the children.  The mother admitted that she was unable to recognize the red flags of physical abuse of her children at the time.  The father was charged criminally after two of the mother's older daughters disclosed that the father had sexually abused each of them, and had otherwise physically abused one of them.  The mother obtained a lifetime restraining order against the father in November of 2018, which includes all of her children.

In addition, two other more recent partners showed signs of controlling behavior in their relationships with the mother; one broke into the mother's e-mail account and changed the password, and the other tried to isolate the mother from friends and family.

2.  Neglect.  The mother's conduct demonstrated a pattern of neglect of her children's safety and needs.  Since 2001, there have been multiple reports pursuant to G. L. c. 119, § 51A (51A reports), alleging neglect.  Many of these 51A reports were ultimately supported upon investigation.

In 2002, a 51A report alleged that the mother neglected her two eldest sons by disregarding the risk of their exposure to domestic violence, in particular from her abusive then-partner. Many subsequent 51A reports expressed concerns over the mother's failure to protect her children from exposure to domestic violence, substance abuse, and housing insecurity. Specifically with respect to the child at issue (Nasser), in 2015, when he was five months old, a 51A report was filed following a physical altercation between the mother and her sister. The mother was holding the child at the time. Thereafter, when the child was one year old, a 51A report was filed alleging that the mother drove while intoxicated while the child was in the vehicle.

At the time of trial, there were abiding concerns regarding the mother's failure to protect the child from Brian, who had been charged with the sexual abuse of several of his other, younger siblings. Brian's violent conduct has been a persistent issue since at least some time in 2005, when a 51A report was filed alleging that mother failed to provide age-appropriate supervision for her children after Brian pushed a younger brother out of a three-story window.

In 2018, several 51A reports were filed concerning Mary's disclosure of years of sexual abuse by Brian.[4] In September of

_____

[4] The mother testified that upon learning of the abuse, she removed her younger children from the maternal grandmother's

4

2018, Brian was criminally charged with incest and rape of a child. He was released on his own recognizance and, as a condition of his release, ordered to have no contact with Mary and no unsupervised contact with any children under the age of fourteen. Upon Brian's release, the mother agreed to a safety plan that specified that Brian would not live in the same house as the child. However, after the mother failed to bring the child to visit with his siblings later in the fall of 2018, the department grew concerned that the mother and child were again residing with Brian. The police conducted a well-being check and discovered that the mother and child were indeed present with Brian at the maternal grandmother's house. The mother told police that while she and the child regularly resided in the maternal grandmother's home, they slept in a locked room away from Brian. At trial, the mother admitted the risk that Brian posed to the child.

Concerned that the department would remove the child from her custody, in October of 2018 the mother left Massachusetts

home where she had been living with Brian. However, another 51A report alleged that the mother failed to contact the police until one week after Mary's initial disclosure, and that the mother had allowed her daughters to remain in the maternal grandmother's home with Brian the evening the disclosure was made, despite the department's instructions to return the children to their foster placements. While these allegations were initially supported, upon further review the department ultimately found them not supported.

for Ohio, without informing the department. The department remained unsure of the whereabouts of both the mother and the child until December of 2018, when the mother produced the child after the department filed a motion in the Juvenile Court to compel his production. After a hearing, the judge granted the department temporary custody of the child. At a February 2019 foster care review, the department determined that the mother had demonstrated insufficient behavioral changes to mitigate the risks posed to the child. As a result, in October 2019 the department changed the child's permanency plan from reunification to adoption.

3. The child's special needs. Due to concerns over speech and other developmental delays, the child was assessed for early intervention services in 2017, at age two. While the child's daycare provider suggested the child see certain specialized providers, the mother never acted on these referrals. Rather, the mother terminated early intervention services and unenrolled the child from daycare in 2018. In March of 2019, after the child was removed from the mother's custody, he was referred for an assessment regarding his special needs, at which time he was diagnosed with autism. The mother questioned the child's autism diagnosis and, at trial, admitted that she failed to participate in the child's evaluation on two occasions despite having been

6

asked to cooperate by providing information about the child's early life.

Since entering the department's care, the child has received speech therapy through his individualized education plan.  At the conclusion of trial, the Juvenile Court judge determined that while the child has shown significant improvement in speech, motor control, and behavior issues, he will continue to require multiple special services as he ages.

4.  The mother's mental health.  The mother was diagnosed with bipolar disorder in 2007, at which point she admitted to having homicidal thoughts toward her children.  Her disorder has caused symptoms such as insomnia, excessive sleeping, sadness, racing thoughts, and depression.  She has also been diagnosed with anxiety and posttraumatic stress disorder (PTSD).  The mother testified that her illnesses have made it difficult to work and have caused her to miss meetings regarding the child's care.  The mother attempted suicide on two occasions in 2020, and was hospitalized for over a week after each incident.

5.  Unstable housing and employment.  At the time of trial, the mother was unemployed and had begun receiving Social Security benefits.  The mother has moved many times and has experienced periods of housing instability.  In 2008, she was unable to remain in low-income housing due to numerous police responses to her residence related to domestic violence.  In

7

2014, the family was homeless after they were evicted from their residence in Rhode Island. Also in 2014, the family, including six children, lived in a nonoperational van because their past behavior in shelters rendered them ineligible for continued access.

After the child was born, the mother predominantly lived with the maternal grandmother. The mother admitted to leaving Massachusetts with the child and to residing in Ohio and Connecticut. Since the child was removed from her care, the mother has lived with various partners, the maternal grandmother, and in a housing program called CHANCE. When trial commenced, the mother was living with the maternal grandmother.

6. The child's preadoptive home. The child was placed in a preadoptive home in February of 2020. The child's preadoptive parents have cooperated with his providers, and he has made significant strides toward achieving his developmental goals. The child is bonded to his preadoptive parents, turning to them for help when in need and calling them "mom" and "dad." The child reported that he wanted to be adopted by his preadoptive parents.

Discussion. On appeal, the mother challenges the judge's reliance on the family's history of domestic violence and certain allegations of her neglect. The mother also argues that the judge committed clear error in multiple regards, among them

8

(1) improperly relying on a G. L. c. 119, § 51B, report that first supported but, after further review, ultimately did not support allegations of the mother's neglect; (2) discrediting the testimony of the mother's therapist based on her licensure status; (3) faulting the mother for visiting with Brian; and (4) concluding that the mother could not sufficiently benefit from therapy, because she did not inform her therapist that the child was removed after the department discovered him in the same residence as Brian.  The mother does not, however, challenge other evidentiary bases for the judge's ultimate finding of unfitness.  These include multiple episodes of neglect of both the child and his older siblings, persistent mental health issues spanning many years, and unstable housing and employment.  Accordingly, while we acknowledge that some of the mother's challenges to the judge's findings have merit, we conclude that the finding of unfitness is supported based on the substantial evidence that the mother does <u>not</u> challenge, which is compelling and which is not materially undermined by the errors to which the mother points.

1.  <u>Standards for determining unfitness</u>.  We review a decision to terminate parental rights for abuse of discretion or clear error of law.  <u>Adoption of Elena</u>, 446 Mass. 24, 30 (2006).  We afford deference to the trial "judge's assessment of the weight of the evidence and the credibility of the witnesses"

9

(citation omitted).  Adoption of Quentin, 424 Mass. 882, 886 (1997).  To terminate parental rights, the trial judge "must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests."  Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012).  The judge must consider "a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age."  Adoption of Quentin, supra, quoting Adoption of Mary, 414 Mass. 705, 711 (1993).

Here the evidence of the mother's unfitness falls into several categories -- neglect, exposure of her children to domestic violence, mental health issues, and unstable housing and employment.

a.  Neglect.  In evaluating parental fitness, the judge may "rely upon prior patterns of ongoing, repeated, serious parental neglect."  Adoption of Kimberly, 414 Mass. 526, 529 (1993), quoting Adoption of Diane, 400 Mass. 196, 204 (1987).  However, reliance on such evidence is only proper "to the extent that [it] has relevance to current parental fitness."  Adoption of Cesar, 67 Mass. App. Ct. 708, 712 (2006).

Here, the documented history of the mother's neglect is substantial. In the months following the child's birth, 51A reports were filed containing allegations of the mother's neglect of the child on two occasions; one involving a physical altercation between the mother and her sister while the mother was holding the child in her arms, and the second involving the mother's alleged operation of a vehicle while intoxicated while the child was inside. The mother also never followed through after the child's daycare provider made referrals to providers, amidst growing concerns regarding the child's speech and behavioral development. In 2018, despite the mother's knowledge of such concerns, she terminated early intervention services and unenrolled the child from daycare. At various points, the mother questioned the child's autism diagnosis and failed to cooperate effectively in his treatment. Furthermore, the mother failed to keep the child away from Brian, despite the acknowledged risk that Brian posed to the child. After Brian's release following charges of rape, and after agreeing to a safety plan that prohibited the mother from residing with the child in Brian's place of abode, the mother returned to a residence shared with Brian.

The mother takes issue with the judge's reliance on what she alleges is stale evidence of her neglect of the older children. However, judges "may rely upon a parent's past

11

conduct with regard to older children to support a finding of current unfitness as to a different child." Adoption of Luc, 484 Mass. 139, 145 (2020). Indeed, the governing statute states that "the court shall consider" whether a "member of the immediate family of the child has been abused or neglected as a result of the acts or omissions of one or both parents" and any "severe or repetitive conduct of a physically, emotionally or sexually abusive or neglectful nature . . . toward another child in the home." G. L. c. 210, § 3 (c) (ii) & (ix).

The mother failed to protect several of her older children from threats posed by the father and by Brian. Several of the older children were sexually and physically abused by the father, sometimes with the mother present. In 2005, Brian pushed a younger sibling out of a three-story window while they were under the mother's care. During visits with the mother, Brian sexually abused Mary, without the mother's knowledge. The mother also allowed two of her daughters to remain overnight in a residence where Brian was present, after Mary had disclosed sexual abuse by Brian.

b. Domestic violence. Domestic violence is "highly relevant to a judge's determination of parental unfitness." Adoption of Gillian, 63 Mass. App. Ct. 398, 404 n.6 (2005). This court has clarified that a parent's improvements in addressing domestic violence do "not preclude consideration of

12

past behavior as a means of predicting the likely future." Care & Protection of Olga, 57 Mass. App. Ct. 821, 830 (2003).

The mother has a long history of choosing partners that proved abusive both to her and to her children. She admitted that in the past she was unable to recognize the red flags of physical abuse of her children. The mother argues that while she may have been unable to appropriately address the risk of domestic violence in the past, two of her recent relationships show an improvement in her ability to choose less dangerous partners. The judge considered both relationships and found that both partners showed signs of controlling behavior. It was appropriate for the judge to consider these partners' controlling behavior in evaluating whether the child is at risk of exposure to domestic violence in the future. See Adoption of Jacob, 99 Mass. App. Ct. 258, 264 (2021) (controlling and threatening behavior toward mother, including confiscating her cell phone, was relevant to judge's finding of unfitness).

c. Mental health issues. A parent's mental health is relevant to a determination of their fitness if the issues "affect[] the parents' capacity to assume parental responsibility, and ability to deal with a child's special needs." Adoption of Frederick, 405 Mass. 1, 9 (1989). The mother has been diagnosed with bipolar disorder, PTSD, and anxiety. The mother's issues have made it difficult for her to

work, and she admits that her illnesses have made it challenging to attend meetings concerning the care of the child.  The mother also attempted suicide twice in the year before the trial began, which led to hospitalizations of over one week.

d.  Unstable housing and employment.  Chronic unemployment and an inability to maintain stable housing may be considered in determining parental fitness.  See Adoption of Azziza, 77 Mass. App. Ct. 363, 365 (2010); Care & Protection of Lillith, 61 Mass. App. Ct. 139, 136 (2004) (frequent moving with child was properly considered in evaluating parental fitness).

At the time of trial the mother was unemployed.  The mother has also been unable to maintain stable housing throughout much of her involvement with the department.  She has lived in shelters, has been homeless, has lived with abusive partners, and has relied on her mother to shelter her.  She has been evicted from low-income housing due to domestic violence-related police responses to her residence.  Immediately prior to the child entering the department's custody, the mother fled the Commonwealth and resided in both Ohio and Connecticut, all without informing the department of her or the child's whereabouts.

In view of the foregoing, the judge's finding of unfitness is well supported by the evidence.

14

2. The mother's allegations of error by the judge. In addition to the arguments discussed above, the mother contends that the judge erred in several other respects. We consider below those arguments that merit further discussion. While the mother's arguments regarding certain of the judge's findings and conclusions have merit, such challenges do not warrant our disturbance of the judge's ultimate finding of unfitness.

a. Discrediting the testimony of the mother's therapist. The mother began seeing a new therapist, Stephanie Hill, in 2020. Hill testified on the mother's behalf at trial, but the judge found that Hill was not a licensed therapist within the Commonwealth and thus, that she was not "an adequate mental health professional capable of assisting [the] [m]other in treating her mental health issues." Hill testified that while she holds herself out as a counsellor, she does not currently have a license in Massachusetts. The mother contends that it was error for the judge to discredit Hill's testimony based on her licensure status, and that this prejudiced the mother because it contributed to findings that the mother failed to adequately address her mental health issues. We note that the relevant language of the department's action plan stated that the mother agreed to "engage in individual counselling to address and process her traumas, losses, and history of domestic violence." It did not stipulate that the mother was to see a

15

therapist licensed in Massachusetts.  Where the department was apparently aware of the therapist the mother was seeing and made no objection, it was inappropriate to criticize the mother for her choice of therapist and to discredit Hill's testimony on the basis that she was not licensed as of the time of trial.[5]

    b.  <u>Faulting the mother for visiting with Brian</u>.  A parent's "refusal . . . to maintain service plans, visitation schedules, and counseling programs designed to strengthen the family unit are relevant to the determination of unfitness." <u>Petitions of Dep't of Social Servs. to Dispense with Consent to Adoption</u>, 399 Mass. 279, 289 (1987).  The department's safety plan, to which mother agreed, stated that she could not reside with the child in the same place as Brian.  Nevertheless, in conducting a well-being check police found the mother and the child present with Brian at the maternal grandmother's house.  Citing this episode, among other evidence, the judge concluded that the mother is unable to set boundaries with Brian and that this causes instability in the child's life.  While this conclusion was well grounded the judge went further, and also faulted the mother for "fail[ing] to take a side" between Mary

---

    [5] The mother makes a related argument concerning the judge's failure to qualify another of her witnesses, Julie Montminy, PhD, as an expert witness.  There was no error as to Dr. Montminy, however, because the mother's counsel had explicitly stated that she would not be proffering Dr. Montminy as an expert witness.

16

and Brian after Mary disclosed Brian's sexual abuse, and of "desir[ing] to continue a relationship with Brian."  The mother argues that in faulting her for visiting with Brian, the judge effectively asked her to choose between two of her children. While it was proper for the judge to consider the mother's noncompliance with a safety plan designed to protect the interests of the child, nothing in the record indicates that the plan prohibited the mother from maintaining her own relationship with Brian.  Accordingly, it was inappropriate to give weight to the mother's desire to remain connected with another of the children in finding her unfit to parent the child.

c.  <u>Reliance on unsupported allegations in 51A reports</u>.  In finding the mother unfit, the judge also relied on allegations in several 51A reports, including that the mother delayed in informing the department of her daughter's disclosure of sexual abuse by Brian and that she failed to heed the department's instruction that she bring her daughters back to their foster placement on the evening of the disclosure.  The mother argues that it was error for the judge to rely on these allegations because, while they were initially supported, they were ultimately found unsupported upon review.  We agree that the judge's reliance on the unsupported allegations was improper.

d.  <u>Faulting the mother for failing to disclose certain facts to her therapist</u>.  Finally, the judge faulted the mother

17

for failing to disclose during therapy that the child had been removed from her custody after the department discovered him present with Brian in the maternal grandmother's home in violation of the family's safety plan. The judge did not explain his reasoning in this regard, or why the nondisclosure evidenced an inability to benefit from therapy.

Conclusion.  In sum, the judge found that the mother had engaged in serious neglect, and had significant and recurring problems with domestic violence, mental illness, housing and employment.  Although the judge's decision was not without error, as discussed above, those errors do not materially undermine the judge's other findings and fundamental concerns. The decree is affirmed.

So ordered.

By the Court (Englander,
  Hand & Brennan, JJ.[6]),

Assistant Clerk

Entered:  May 15, 2024.

---

[6] The panelists are listed in order of seniority.