NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-451

ADOPTION OF NOVA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother and the father appeal from decrees entered by a judge of the Juvenile Court terminating their parental rights to their child, as well as the denial of their posttrial motions. We affirm.

Background.  Between 2016 and 2019, the mother and the father (parents), the biological parents of Nova (child), were licensed foster parents, approved to provide foster care by the Department of Children and Families (department).  In July 2019, two foster children who had been placed in the parents' home disclosed significant and serious sexual abuse, including rape, by the father.  The foster children participated in forensic interviews and the father was subsequently arrested on a number of charges, including six counts of aggravated rape of a child

_____

[1] A pseudonym.

with force and nine counts of indecent assault and battery on a child under fourteen years old.  The father, upon making bail, was released with conditions prohibiting any unsupervised contact with minors.  Those charges were still pending at the time of trial.

These disclosures motivated the filing of a report pursuant to G. L. c. 119, § 51A (51A report), alleging sexual abuse and neglect of the child by the father and neglect by the mother.  Following an investigation, the allegations of sexual abuse by the father were unsupported, but the allegations of neglect by the mother and the father were supported.  The department conducted an emergency removal of the child and filed the underlying care and protection petition.

Less than a month later, in August 2019, a 51A report was filed alleging sexual abuse of one of the former foster children by the mother following that child's disclosure that the mother touched her in her "private parts" and showed her pictures of the mother and the father having sex.  The former foster child alleged that the mother was aware that the father had been sexually abusing the foster children.  The allegations of sexual abuse by the mother were investigated and supported.

In September 2019, when the social worker was transporting the child, then age four, to her first visit with the father since she had been removed, the child asked the social worker

whom she was going to visit. When the social worker told the child she was going to see her parents, the child started giggling and covered her face. She stated that she took a lot of showers with the father, during which neither of them was wearing any pants, and that she felt weird because she was not wearing pants. She also stated that the father was frequently naked and exposed his "privates and his belly," which made her feel weird because he was not wearing any pants. The child explained that the mother was home during the times the child showered with the father and that sometimes she showered with both parents. Based on those statements, the department arranged to have the child participate in a forensic interview, which took place the following month, in October 2019. During the interview, the child said only that she takes showers with "daddy" but added no detail.

In September 2020, when the child was five years old, she participated in the first of two trauma evaluations. The evaluation consisted of four clinical interviews. During the second session, the child stated that the father tickled her a lot; that she was on the bed with no clothes on and he touched her front and back "tushie"; that he tickled her with his fingers and that "Mommy was there and said it was okay"; that he poked her with his finger and "did stuff to Mommy too"; and that she and the father and the mother shower together a lot.

3

During the third session, the child stated that the father touches her in the shower and in the bed and that she had seen him touch her half-sister too. She also stated that she did not like it when the father asked her to touch his "pee pee." She stated, "[I]t got real big like a cucumber." The child again stated that the mother was there, and that the mother did not like the father touching the mother's "tushie." She also talked about being scared because she gets hurt and being scared that she will get hurt. During the final session, the child again stated that the father touched her half-sister, that he tickled her half-sister's private parts with his fingers, and that "mommy was there." At this point in the interview, the child began to throw toys on the floor, made random guttural sounds, and laughed frenetically. Throughout the sessions, the interviewer noted that following the child's disclosures, her "behavior was marked by increased agitation and aggression," and that she "repeatedly expressed feeling unsafe both in words and in symbolic play."

In late October 2020, the child participated in a second forensic interview. During this interview, when the child was asked about the tickling she had previously disclosed, the child's demeanor changed. The child stated that she was worried about her mother and father and then grabbed a pillow, stating that she needed to hug something soft. Due to the child's

4

reaction, the interview was suspended and a second session was scheduled. During the second session, when the child was again asked about tickling, she became quiet and would not answer any follow up questions. She stated that her heart was running and she did not want to talk about her family because it made her feel shy. The interview was again terminated based on the child's reaction.

The child participated in a second trauma evaluation between April 2022 and July 2022. She was seven years old. When talking about forms of touch, the child was observed to become uncomfortable. When asked questions about "private parts," the child stated that she did not like to talk about that because "it made her scared, sad, and uncomfortable." She later stated that tickling made her feel nervous and that her father tickled her everywhere before she was placed in foster care. The child then told the interviewer that she thought the interviewer was going to ask her about her "tushie," pointing to her vaginal area and anus. The child continued, stating, "I don't want to say it. It doesn't happen now, and I don't like that people did that to me. People don't touch private parts at school."

During the next session, the child spontaneously stated that no one touches her private parts now. She stated that her mother and her father touched her private parts to clean, but

maybe her father touched her private parts "on accident."  The interviewer attributed this statement to the child's attempt to avoid acknowledging the reality of what had happened to her. The child also stated that she sometimes felt unsafe and scared when she was living with her parents.  After a brief break, she stated that she was "safe now," and that her foster parents do not touch her private parts.  Towards the end of the session, the child had curled up in a ball and was having a difficult time.  She told the interviewer that the house she was in now (the foster home) was "so safe."

In 2022, at a hearing on the department's motion to admit the statements described above pursuant to G. L. c. 233, § 82 (§ 82 hearing), the judge heard testimony from the social worker assigned to the child's case and from the clinicians who had conducted the trauma evaluations.  She considered twenty-eight exhibits, including the written reports from the evaluations. The social worker testified to the statements the child made to her during the car ride to and from the child's first visit with her father, as well as the circumstances in which the statements were made, and the child's demeanor.  The clinicians, each of whom was qualified as an expert in sexual abuse trauma evaluations, testified to the statements the child made and the behavior they observed during the evaluations.  The clinicians also testified that the child's behavior was consistent with

6

that of a child victim of sexual abuse.  Both the mother's and the father's trial counsel cross-examined the witnesses.

The judge credited the testimony of each witness as well as the opinions of the clinicians.  The judge found the child's statements to be reliable, noting the multiple, consistent statements of sexual contact, the circumstances in which the child's initial disclosure was made, the detailed nature of the statements, the child's behavior when making the statements and during the interviews, as well as the child's statements relative to her feelings about the sexual contact.  The judge ruled that the child's statements regarding sexual contact were admissible at the termination of parental rights trial.

Following the trial, the judge found the mother and the father unfit to parent the child, terminated their parental rights, and approved the department's plan of adoption with the child's current preadoptive parents.  The father filed a motion for a new trial, and the mother filed a motion for relief from judgment and for new trial based on ineffective assistance of counsel (posttrial motions).  Those motions were denied and the parents appealed.

Discussion. 1. Denial of posttrial motions. Parents may seek to vacate decrees "by analogy and under the 'cogent standard' of Mass. R. Civ. P. 60 (b)[, 365 Mass. 828 (1974)]" (citation omitted).  Adoption of Yvette (No. 1), 71 Mass. App.

7

Ct. 327, 335 n.9 (2008).  We review an order denying a rule 60 (b) (6) motion for "clear abuse of discretion" (citation omitted).  Adoption of Yvonne, 99 Mass. App. Ct. 574, 583-584 (2021) (discussing relevant factors in rule 60 [b] [6] analysis).  Where, as here, the "motion judge and the trial judge were one and the same, we extend special deference."  Commonwealth v. DeJesus, 71 Mass. App. Ct. 799, 811 (2008).

a.  Constructive denial of counsel (father).  We are not persuaded by the father's argument that trial counsel's alleged failings were so egregious as to amount to the constructive denial of counsel, thereby relieving the father of his obligation to prove prejudice.  Cf. United States v. Cronic, 466 U.S. 648, 659-660 & n. 25 (1984) (Court has "uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting [the client] at a critical stage of the proceeding").

Here, the father argues that counsel's "unilateral decision" to concede his parental unfitness amounts to a constructive denial of counsel.  The record does not support his claim.  Counsel's affidavit indicates that the father directed her to request that permanent custody of the child be granted to the paternal grandmother, and that many strategic decisions were

based on this stated goal.[2]  Where counsel was acting at the father's direction, the judge did not err in concluding that a showing of prejudice was required.

b.  Ineffective assistance of counsel (both parents).  To prevail on a claim of ineffective assistance of counsel, each parent must show that counsel's performance fell "measurably below that which might be expected from an ordinary fallible lawyer," Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), and that they were prejudiced.  See Adoption of Azziza, 77 Mass. App. Ct. 363, 368 (2010), citing Adoption of Holly, 432 Mass. 680, 690 (2000).  See also Care & Protection of Georgette, 439 Mass. 28, 33-34 & n. 7 (2003).  "[W]here a strategic choice is at issue, [a]n attorney's tactical decision amounts to ineffective assistance of counsel only if it was manifestly unreasonable when made" (quotation and citation omitted).  Adoption of Azziza, supra.  Deference is given to counsel's tactical decisions.  Commonwealth v. White, 409 Mass. 266, 273 (1991); Commonwealth v. Adams, 374 Mass. 722, 728 (1978).

i.  The mother's claims of ineffective assistance of counsel.  The mother argues that her counsel was ineffective in

_____

[2] This position is in keeping with the father's representation at the September 2020 status hearing, held after the child's goal had been changed to adoption, that he would stipulate to permanent custody, and that it "comes down to placement" of the child.

9

failing to properly challenge the admission of the child's statements at the § 82 hearing and failing to present positive evidence about the visits between the mother and the child. As to the § 82 hearing, the mother specifically faults counsel for not engaging an expert in autism, and for failing to call the child's previous clinicians as witnesses to contest that the child's behavior corroborated her statements of sexual abuse. We are not persuaded. Counsel's challenged performance cannot be said to fall measurably below that of an ordinary fallible lawyer where the evidence included the February 2019 neuropsychological evaluation report, which detailed the behaviors that led to the child's diagnosis of mild autism spectrum disorder, and the mother's counsel cross-examined the expert witnesses about the similarity between the behaviors that supported the child's diagnosis of autism spectrum disorder and behaviors stemming from sexual abuse.

The mother also maintains that counsel was ineffective in failing to present "[e]vidence of the warmth, affection, and comfort in the mother-daughter relationship." Given the details of the mother's positive visits with the child contained in the court reports prepared by the department pursuant to G. L. c. 119, § 21A and submitted in evidence, we find the mother's

10

argument unpersuasive.[3]  Those court reports contain similar, if not the same, information as the dictation to which the mother cited to support her claim, and the judge made findings favorable to the mother in that regard.

The mother also identifies what she contends are critical contradictions in the judge's various articulations of the reasons for the denial of the mother's request for visitation. Although the judge's findings on this issue are not entirely consistent, any inconsistencies did not give rise to prejudicial error.  An order for postadoption contact must be "grounded in the over-all best interests of the child, based on emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent."  Adoption of Vito, 431 Mass. 550, 563, 562 (2000).  Where other circumstances, including the mother's denial of the sexual abuse and her potential residency with the father, indicated that visitation would not be in the child's best interests, the judge did not abuse her discretion in declining to order any

_____

[3] The mother's argument that counsel was ineffective for failing to request posttermination and postadoption visitation is similarly unpersuasive, as the judge's authority to order such visitation is "rooted in [the judge's] broad equitable powers," which include the ability to issue a "sua sponte order of visitation."  Adoption of Odetta, 87 Mass. App. Ct. 576, 578 (2015), citing Youmans v. Ramos, 429 Mass. 774, 780-784 (1999).

11

posttermination or postadoption contact.  See Adoption of

Xarissa, 99 Mass. App. Ct. 610, 623-624 (2021).

Even if we concluded that counsel's performance fell

measurably below that of an ordinary fallible attorney, there

was no showing of prejudice.  The mother presented no reason for

us to conclude that, had counsel consulted the experts and

presented the evidence discussed above, the outcome would have

been different.  See Commonwealth v. Amirault, 424 Mass. 618,

652 (1997), quoting Strickland v. Washington, 466 U.S. 668, 693

(1984) ("not every error that conceivably could have influenced

the outcome undermines the reliability of the result of the

proceeding").  Thus, the judge did not err in denying the

mother's motion for relief from judgment and for new trial.

ii.  The father's claims of ineffective assistance of

counsel.  The father alleges that his trial counsel's decision

not to consult certain experts or to introduce evidence that the

father's mother had been approved as a foster placement for the

child was ineffective assistance.[4]  A review of counsel's

affidavits submitted in support of the father's motion for a new

trial indicates that her decisions regarding witnesses and other

---

[4] The father also maintains that counsel was ineffective in failing to request "readily available first-hand evidence of the children's interviews."  We are unpersuaded.  The record reveals that the father's counsel had access to 51A and G. L. c. 119, § 51B reports related to the foster children's interviews.

12

evidence were strategically directed toward furthering the father's stated goal of having the child in his mother's permanent custody.  Counsel also took into account the potential impact that challenging the father's unfitness, and specifically the allegations of sexual abuse, would have on his pending criminal case.  Given this evidence of thoughtful consideration and in light of the father's pending criminal charges for child sexual assault -- for which, if convicted, he could be facing life imprisonment -- counsel's decisions were not manifestly unreasonable.  See Adoption of Azziza, 77 Mass. App. Ct. at 368.

The father also contends that counsel was ineffective for not permitting him to testify, citing counsel's misunderstanding of the law regarding the father's privilege under the Fifth Amendment to the United States Constitution.  The father's argument overlooks the fact that counsel gave this advice after consulting with his criminal defense attorney, with whom trial counsel consulted throughout the case and who specifically instructed her and the father that the father should not testify.[5]

Even were we to conclude that counsel's performance was ineffective, there was overwhelming evidence of the father's

---

[5] We note that the father's testimony could have been used to impeach him in his criminal trial, see Care and Protection of M.C., 479 Mass. 246, 262 n.9 (2018).

13

unfitness and, therefore, no prejudice.  The father was unavailable to parent his child due to the conditions of pretrial release that prohibited him from having any unsupervised contact with minors, including his own, and was facing life imprisonment.  There was no error.

iii.  Lack of evidentiary hearing.  We are not persuaded by the father's argument that the judge was required to grant an evidentiary hearing on his motion for a new trial.

> "Whether to hold a hearing on a motion for a new trial is within the judge's discretion, . . . and the judge may 'decide a motion for a new trial without an evidentiary hearing where no substantial issue is raised by the motion or affidavits.' . . .  When the motion judge is also the trial judge, as in this case, she may use her 'knowledge and evaluation of the evidence at trial in determining whether to decide the motion for a new trial without an evidentiary hearing.' . . .  We give substantial deference to a judge's conclusion in this regard."

Commonwealth v. Morgan, 453 Mass. 54, 64 (2009).  In light of the discussion above, we see no abuse of discretion in, and therefore no reason to disturb, the trial judge's conclusion that the motion and affidavits raised no substantial issue requiring an evidentiary hearing.

2.  Child's statements regarding sexual abuse.  A child's out-of-court statement regarding sexual abuse is admissible pursuant to G. L. c. 233, § 82, provided, among other things, that the judge finds the statement reliable.  Specifically, the judge must find that the "statement was made under circumstances

14

inherently demonstrating a special guarantee of reliability."
Id. A judge considers four factors when assessing the
reliability of the statements: i) "the child's capacity to
observe, remember, and give expression to that which such child
has seen, heard, or experienced"; ii) "the time, content, and
circumstances of the statement"; iii) "the existence of
corroborative evidence of the substance of the statement
regarding the abuse including either the act, the circumstances,
or the identity of the perpetrator"; and iv) "the child's
sincerity and ability to appreciate the consequences of the
statement." Id. We focus, as did the parents, on the third
factor.

We discern no error in the judge's finding that the child's
statements were reliable and therefore admissible at the trial
as substantive evidence. The judge was presented with evidence
of the child's knowledge that her father's "pee-pee" "got real
big like a cucumber" when she touched it, the circumstances of
the child's disclosures and statements, and expert testimony
that the child's behavior during the interviews was consistent
with that of a child who has been sexually abused. This was
sufficient to corroborate the child's statements. See Adoption
of Quentin, 424 Mass. 882, 889 (1997) ("observed events, coupled
with expert testimony credited by the judge . . . are some
evidence of sexual abuse that does not depend on the out-of-

15

court statements of the children").  See also <u>Adoption of Olivette</u>, 79 Mass. App. Ct. 141, 150 (2011) ("sexualized behavior or age-inappropriate knowledge of sexual matters" are sufficient to corroborate allegations of sexual abuse).

3.  <u>Permanency plan for the child</u>.  Both the mother and the father maintain that the judge abused her discretion in declining to award custody of the child to her paternal grandmother.  The father views as clearly erroneous the judge's findings that the grandmother failed to acknowledge the child's allegations and could not independently provide a plan as to how she would protect the child without direction from the department.  However, the father mischaracterizes those findings.  The judge found that "[t]he Department did not find that Paternal Grandmother accepted or acknowledged the abuse that [the child] endured by [the] Father" and that "[t]he Department did not find that Paternal Grandmother was able to independently provide a plan as to how she would protect the child" without direction from the department.  The parents' arguments on this issue amount to dissatisfaction with the weight the judge assigned certain evidence.  "[T]he judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference."  <u>Custody of Eleanor</u>, 414 Mass. 795, 799 (1993); and a judge is not obligated to credit all evidence equally.  See <u>Care & Protection of Three</u>

16

Minors, 392 Mass. 704, 711 (1984). There was no error or abuse of discretion.

4. Sibling visitation. The father contends that the judge abused her discretion in failing to order sibling visitation between the child and her paternal half-sister, who was in her mother's custody. General Laws, c. 119, § 26B (b), fourth par., permits a child in the custody of the department or a sibling of that child to file a petition for sibling visitation. Adoption of Flavia, 104 Mass. App. Ct. 40, 57 (2024). Because the judge's findings are dispositive of the issue, we pass on the question of whether the father had standing to raise it. Here, the judge was "incredibly concerned for [the child's] therapeutic needs" relative to her relationship with her half-sister. This concern was supported by, among other things, the judge's uncontested finding that father frequently used the half-sister as a conduit to perpetrate his alleged abuse of the foster children. Implicit in the judge's rulings is her determination that an order of sibling visitation was not in the child's best interests. Contrary to the father's argument, it was not necessary to consider the best interests of the child's half-sister once the court determined visitation would not be in the child's best interests. See id. (a judge may order sibling visitation only where such visitation is in "the best interests

17

of the petitioning child and each sibling with whom visitation is sought").  The judge did not abuse her discretion in declining to order sibling visitation.

Decrees affirmed.

Order denying posttrial
   motions affirmed.

By the Court (Englander,
   Hershfang & Brennan, JJ.[6]),

Clerk

Entered:  January 27, 2025.

---

[6] The panelists are listed in order of seniority.