NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-696

ADOPTION OF CATALINA (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from the decrees of a Juvenile Court judge terminating his parental rights regarding his children, Catalina and Javon (twins), and from the denial of a motion for relief from judgment and for a new trial. We affirm.

Background. Weeks before the twins were born, the Department of Children and Families (department) became involved after the father, age twenty, threw the mother of the children on the bed and elbowed her in the abdomen. Following this incident, a report filed pursuant to G. L. c. 119, § 51A (51A report), alleged that the father neglected the children due to assaulting the mother, then thirty-six weeks pregnant with the twins. The department investigated the allegation of neglect, substantiated the report, and worked with the mother to prepare

_____

[1] Adoption of Javon. The children's names are pseudonyms.

a safety plan, which included not exposing her children to the father or domestic violence.  The mother gave birth to the twins on March 1, 2021.  A District Court judge later dismissed criminal charges related to the incident.

A day after the twins' birth, the department received another 51A report alleging neglect of the children and exposure to ongoing domestic violence between the mother and the father. An investigation indicated that the father and the mother did not follow the department safety plan.  The department took emergency custody of the children and filed a care and protection petition on March 4, 2021.  A month later, the department returned the children to the mother, but she and the father disregarded a condition that required third-party supervision of the father's visits to the children.

During an argument with the children present on July 12, 2021, the father pushed past the mother, brandished a firearm, and said "If I can't have the kids, neither can you."  The police later arrested the father and charged him with threatening to kill, assault and battery on a family or household member, assault with a dangerous weapon, and receiving stolen property.  The father pleaded guilty to these charges and received a sentence of two and one-half years.  The incident also resulted in a violation of his probation on prior charges,

2

and he received a concurrent prison sentence of from four years to four years and one day.

As a result of the assault, the mother obtained a G. L. c. 209A protective order against the father, prohibiting contact with her or the children for a year. Once the order terminated in July 2022, the father did not establish paternity until March 2023. The father remained absent from the children's lives from July 2021 until April 2023. While incarcerated, the father began having biweekly virtual visits with the children in April 2023.

On October 31, 2023, following a trial (where the mother stipulated to the termination of her parental rights), a judge found the father unfit, determined that the children were in need of care and protection, and terminated the father's parental rights. The judge approved the department's plan of adoption by the preadoptive mother with whom the children have lived since September 2021.

On April 16, 2024, the father filed a motion for relief from judgment and for a new trial pursuant to Mass. R. Civ. P. 60 (b), 365 Mass. 828 (1974). He claimed that counsel rendered ineffective assistance, and for the first time claimed that the judge erred in failing to consider the defendant's age, in conjunction with his troubled and abusive childhood, when he

3

committed crimes and the children's race, culture, and heritage. He also argued that the judge abused his discretion in finding that the department made reasonable efforts. Following a nonevidentiary hearing, the judge denied the father's motion on July 5, 2024. On appeal, the father raises the same substantive issues, though somewhat reformulated.

Discussion. 1. Postdecree motion. a. Standard of review. "A motion for relief from judgment on any of the grounds identified in rule 60 (b) is generally committed to the sound discretion of the motion judge." Adoption of Yvonne, 99 Mass. App. Ct. 574, 583 (2021). "[R]elief under rule 60 (b) (6) requires a showing of 'extraordinary circumstances.'" (citation omitted). Adoption of Yvonne, supra at 584. "We review the denial of a motion for new trial for an abuse of discretion." Adoption of Raissa, 93 Mass. App. Ct. 447, 455 (2018). We discern no abuse of discretion or extraordinary circumstances that merit relief.

b. Ineffective assistance of counsel. The father argues that trial counsel rendered ineffective assistance because she failed to (1) file motions in limine regarding trial exhibits, (2) file a motion challenging the department's reasonable efforts aimed at reunification, (3) offer any witnesses or exhibits, and (4) challenge the department's adoption plans,

4

which omitted any mention of the children's race, culture, and heritage.  To prevail on such a claim, the father must show conduct falling "measurably below that which might be expected from an ordinary fallible lawyer" that resulted in prejudice. Adoption of Yvette, 71 Mass. App. Ct. 327, 345 (2008), quoting Care & Protection of Stephen, 401 Mass. 144, 149 (1987).  See Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  "[P]rejudice is not shown if there is overwhelming evidence of unfitness." Adoption of Azziza, 77 Mass. App. Ct. 363, 368 (2010).

A cautionary note in Saferian is particularly apt here: "we are not impressed with [a party's] offering us a checklist of the pre-trial motions that could theoretically have been made but were passed over."  Saferian, 366 Mass. at 98-99.  We agree with the trial judge's assessment that motions in limine would have been unavailing as the father was "barely mentioned" in the exhibits at issue, the 51A reports were admitted "solely to set the stage," and the judge did not consider inadmissible hearsay.

Likewise, a motion related to the department's reasonable efforts to reunify the family would not have met with success. The father cites the department's "Foster Care Review Report" dated September 25, 2023, that noted during the six months under review the department had not "made efforts" to meet with the incarcerated father monthly to discuss the case as required by

5

department policy. He also cites a report from a year earlier in which a dissenting member of the review panel believed the department had "inconsistently visited" with the father in prison and had not provided an action plan. Such reports, however, cover only six-month review periods and provide only a snapshot of the department's relationship with the father. Trial testimony from the ongoing social worker assigned to the case provided a more comprehensive view of the department's efforts in communicating with the father and supporting reunification with the children. That social worker testified that she had been assigned to the case for approximately two years (since November 2021). She conducted virtual "home visits" at the prison with the father through video conferencing. During this period, the department learned that the father was not listed on the birth certificates, and the social worker informed the father that he needed to establish paternity for visitation. They discussed services that were available to him and behavioral, educational, and medical updates about the children. He asked no follow-up questions about his children. They also discussed tasks on his action plan that he did not complete as well as his participation in various prison programs. The social worker also conducted approximately six to ten virtual supervised visits between the

father and the children.  She further testified that the father never attempted to contact her or request alternative methods of communication.  Based on the evidence presented, we discern no error in the judge's conclusion that the department made reasonable efforts and the absence of any motion on that issue did not demonstrate ineffective assistance.

We also discern no error and no prejudice from the absence of witnesses and exhibits offered by counsel.  The father has not identified any witnesses or documents that were available and could have impacted the judge's decision.  See Commonwealth v. Carlton, 43 Mass. App. Ct. 702, 705 (1997) (discussing offer of proof as necessary to show that "better work might have accomplished something material for the defense" [citation omitted]).  Under these circumstances, counsel cannot be faulted for a prejudicial error.

The same flaw exists in the father's contention that trial counsel failed to address issues regarding race, culture, and heritage.  The father offers no evidence that identifies aspects of racial or cultural background particular to these children that could have been helpful.  Even if such evidence existed, the evidence of the father's unfitness -- especially his prolonged absence from the lives of his children and the domestic violence committed in the presence of his children --

was overwhelming.  See Adoption of Azziza, 77 Mass. App. Ct. at 368 ("prejudice must be shown; prejudice is not shown if there is overwhelming evidence of unfitness").  Counsel "played the few cards [she] had," Saferian, 366 Mass. at 93, and emphasized the father's troubled background (including being shot at the age of fifteen), his own experience as a child in foster care, his love for his children, his desire that they must never feel abandoned, and his strong work ethic.

Unlike the father, we do not fault counsel for her candid general acknowledgement that "things would be different" if she tried the case again.  "Invariably the lawyer who refights a campaign on the written record finds ways to fight it better.  Indeed, it must be a smug lawyer who, upon completing a trial or an argument, does not reflect ruefully on what should have been said or done."  Commonwealth v. McGann, 20 Mass. App. Ct. 59, 61 (1985).  Though unsuccessful, counsel's approach did not evince "serious incompetency, inefficiency, or inattention."  Saferian, 366 Mass. at 96.

c.  Father's age and criminal history.  We disagree with the father's claim that the judge erred by considering the father's criminal conduct in the unfitness determination.  He contends that his criminal acts were committed while his adolescent brain was developing and cannot form any basis for

8

predicting his future ability to parent his children.  He contends that his argument is a logical application of Commonwealth v. Mattis, 493 Mass. 216, 217-218 (2024), in which the Supreme Judicial Court recognized that eighteen to twenty year olds require greater protections during sentencing due to immature brain development.  Contrary to the father's contention, the judge properly considered the criminal conduct as well as the factors set forth in G. L. c. 119, § 26, and G. L. c. 210, § 3 (c), including the best interest of the children, in making his decision.

Mattis does not control the result here.  "Custody proceedings are not criminal in nature and, accordingly, the full panoply of constitutional rights afforded criminal defendants does not apply in these cases."  Custody of Two Minors, 396 Mass. 610, 616 (1986).  Even assuming that the underlying science of adolescent brain development discussed in Mattis applies in care and protection proceedings, "the parents' rights are secondary to the child's best interests and . . . the proper focus of termination proceedings is the welfare of the child."  Adoption of Ilona, 459 Mass. 53, 61 (2011), quoting Adoption of Gregory, 434 Mass. 117, 121 (2001).  See Adoption of Ilona, supra at 62, quoting Custody of a Minor, 375 Mass. 733,

9

749 (1978) ("best interest of child paramount consideration where child's well-being at issue").

The judge did not err. Consideration of a parent's criminal history is "germane" in care and protection proceedings. Care & Protection of Quinn, 54 Mass. App. Ct. 117, 125 (2002). The father has been incarcerated for almost the entirety of the children's lives. He has an extensive criminal history of violent offenses, including two incidents of domestic violence against the children's mother. See Custody of Two Minors, 396 Mass. at 621 ("The court is permitted to assess prognostic evidence derived from prior patterns of parental neglect or misconduct in determining future fitness"). The judge expressly did not consider the father's juvenile record in the unfitness determination, as the court acknowledged the father's juvenile record only to "contextualize" his placement in the Department of Youth Services. The judge properly considered the father's criminal history, and his findings demonstrate a sufficient link between that history and his inability to provide adequate care for the children. We agree with the judge that the children need "a stable, consistent, and safe environment" and see no abuse of discretion in his conclusion that the father's "violent tendencies and criminal conduct" is a strong indicator that his "unfitness is likely to

10

continue into the future to a near certitude."  See Adoption of Ilona, 459 Mass. at 60 ("Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period").

d.  Race, culture, and heritage.  The father also asserts that the judge erred by not considering the race, culture, and heritage of the children in determining whether the department's proposed adoption plan was in the best interest of the children. While judges may consider a child's "racial and cultural development and adjustment" in determining whether an adoption plan is in the child's best interests, Adoption of Vito, 431 Mass. 550, 567 (2000), such consideration must be based on "the particular needs and circumstances of the individual child in question," not on "[g]eneralities about what may be in the best interests of some children."  Id. at 566.  Especially where visitation with other siblings is ongoing, the record here fails to demonstrate that the children would sense alienation from their background or that the preadoptive mother would deprive them of meaningful connections to their heritage.  The father merely speculates that the children may face these difficulties based on general ideas of what could occur when some children are adopted by some families of a different race.  It would have

11

been inappropriate for the judge to deny the adoption plans on nothing more than this speculation.  See Id. at 567.

Given the children's strong bond to the preadoptive mother, the father's failure to form a significant bond with the children, and the father not offering any plan for alternative placement, the judge did not err or abuse his discretion in approving the department's plan for adoption.

Decrees affirmed.

Order denying motion for relief from judgment and for a new trial affirmed.

By the Court (Meade, Hodgens & Toone, JJ.[2]),

Paul Petitte

Clerk

Entered:  May 9, 2025.

---

[2] The panelists are listed in order of seniority.